Filed 3/23/26  P. v. Kittles CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>DESHUN A. KITTLES,<br><br>      Defendant and Appellant. | A173585<br><br>(San Francisco City & County Super. Ct. No. CRI15025600) |

Defendant Deshun A. Kittles appeals from the trial court's order denying his petition for resentencing pursuant to Penal Code section 1172.6.[1] His appointed counsel has filed a brief, raising no issues and asking this court to exercise our discretion to conduct an independent review pursuant to *People v. Delgadillo* (2022) 14 Cal.5th 216 (*Delgadillo*).  Defendant thereafter filed a supplemental brief raising issues for our consideration.  We affirm.

### BACKGROUND

The history of this proceeding is set forth in this court's two prior opinions, which we incorporate by reference.[2]

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

[2]  On our own motion, we take judicial notice of our prior opinions *People v. Kittles* (Dec. 10, 2020, A154955) [nonpub. opn.] (*Kittles I*) and *People*

1

"Defendant testified in his own defense about the shooting of R.T. in the Potrero Hill neighborhood of San Francisco. In November 2017, he drove to Potrero Hill, where he had lived until he was 16 years old. He had a handgun with him, a Glock 9 mm, which he knew he was legally prohibited from possessing due to a prior felony conviction. He bought the gun because he had been threatened in the past.

"Defendant's uncle joined him, and the pair went searching for drugs for his uncle. When they were unable to find any, they stopped and bought alcohol, then continued to another location, where his uncle continued his quest for drugs. Defendant did not accompany his uncle, but decided to visit a female friend, S., who lived nearby.

"He went to the residence where he thought S. lived, but it was actually another person's home. Nevertheless, S. was there, and, according to defendant, S. told him to 'meet her out back.'

"Defendant went outside to talk with S., and 'two dudes' were there. One of them was leaning against a railing, and 'the bigger one,' later identified as B.K., said something to defendant which he could not recall, but was 'intimidating.' The man asked 'why you talkin' to my cousin,' and 'in that instant [the man] pulled out a gun and kind of advanced toward [defendant].' According to defendant, 'that's when I went in my pocket and I pointed the gun at this dude advancing towards me with a gun, and I shot. I didn't aim to kill this person. . . . I shot out of fear for my life. I shot because I thought I was going to lose my life in that instant.'

"San Francisco Police Officer Martinez was dispatched with other officers to the area around 2:50 p.m., after the 'ShotSpotter' system detected

_v. Kittles_ (Mar. 9, 2023, A165979) [nonpub. opn.] (_Kittles II_). (Evid. Code, § 452, subd. (a).)

2

four gunshots.  When Martinez arrived, he saw a man lying on the ground 'moaning in pain.'  The victim had several gunshot wounds, in his stomach, hip and arm, and was bleeding.  Later identified as R.T., the victim told the officer he 'was by the stairs and he got shot' by a 'black man.'

"One of the responding officers noticed a residence with an open door and blood on the floor.  B.K., his brother, and his father lived there.  An officer 'attempted to obtain a statement' from B.K., but 'he really did not want to speak to [him].'  B.K. was taken into custody on an outstanding warrant.

"B.K.'s father gave officers permission to search the residence.  No weapons were found.

"Other officers, including Officer Thompson, also responded to the scene and encountered a car speeding down the wrong side of the street near the shooting.  They pulled over the car, which defendant, wearing an Oakland Raiders beanie, was driving. [¶] Thompson could not see defendant's right hand, and he asked defendant to step out of the vehicle.  Defendant refused, so the officer pulled him out.  Defendant's right arm 'came from underneath his jacket,' and the officer saw 'he was holding a black firearm in his hand that was at this point kind of directly pointed at me.'  The firearm, a Glock handgun, fell out of defendant's hand.  Defendant tried to grab it, and the two were 'in a tussle both trying to get the gun.'  Defendant managed to grab it, so Officer Thompson 'delivered like one punch to his head . . . and he let go of the gun at that point.'  Defendant was arrested.

"A neighbor of S.'s testified that on the day of the shooting, she glanced outside and saw a 'black man . . . [wearing] a black beanie with white writing on it' and a black jacket.  He walked past the neighbor's window carrying what looked like a 'black pipe' in his right hand.  As he passed, the neighbor

3

heard 'a female voice saying, "Don't shoot me. Don't shoot me." ' Then she saw S. 'running up the stairs. She got up the stairs and then she slipped; she fell. Then she went into her father-in-law's place,' which was in the next building. After S. ran into the building, the neighbor heard 'two or three gunshots.'

"After she heard the gunshots, she saw the man with the beanie walk up the stairs and stop 'in front of where [S.] had ran inside.' The man 'put his hand up and he shot like two or three times like in the door.'

"Security camera footage from the neighborhood on the day of the shooting showed defendant park his car and walk into the house where S. was. At 2:48 p.m., the door to that residence was closed and defendant was inside for under a minute. Defendant then walked out of the unit toward the balcony. At 2:50 p.m., the recording shows defendant proceeding up the stairs with his right arm out and a black object in his hand.

"A conversation between defendant and his sister when he was in jail was recorded. His sister asked, 'So you were just so drunk brother, just trippin?' Defendant responded 'No, no—that's wasn't—No, no, no, the times when I did what I did, I was in, I was. . . .' His sister responded: 'Well they said it didn't look like it. They was like, you just. . . .' Defendant answered: 'Who look like they in their right mind when they're trying to kill somebody. . . . Who look like they in they right mind—when they try to do something like that?' Defendant testified he was referring to B.K., not himself." (*Kittles I, supra*, A154955, fn. omitted.)

"The San Francisco District Attorney charged defendant with attempted premediated murder ([] § 187, subd. (a), count 1), assault with a firearm (§ 245, subd. (b), count 2), discharging a firearm in a grossly negligent manner (§ 246.3, subd. (a), count 3), possession of a firearm after

4

being convicted of a felony (§ 29800, subd. (a)(1), count 4), possession of a firearm after being convicted of a violent felony (§ 29900, subd. (a)(1), count 5), and resisting a peace officer (§ 148, subd. (a)(1), count 6). As to enhancing allegations, the district attorney alleged personal discharge of a firearm causing great bodily injury (§ 12022.53, subd. (d), count 1), personal use of a firearm and personally inflicting great bodily injury (§ 12022.5, subd. (a), 12022.7, subd. (a), counts 1, 2, 3), prior serious felony strike (§ 667, subds. (d), (e)), and prior prison terms for possession of a firearm by a felon and robbery (§ 667.5, subd. (b)). Count 4 and the prior prison term allegations were subsequently dismissed. The firearm enhancement as to count 3 was not submitted to the jury.

"The jury found the attempted murder was not willful, deliberate, or premeditated, and found defendant guilty of the remaining counts and enhancement allegations true. The trial court sentenced defendant to a total prison term of 26 years (imposing the midterm of seven years for attempted murder, doubled based on his previous strike, plus seven years for the personal use of a firearm and great bodily injury enhancement under §§ 12022.5, subd. (a) & 12022.7, subd. (a) and five years for the prior strike). The court dismissed the section 12022.53, subdivision (d) finding and stayed or ran concurrently the sentences on the remaining counts and allegations." (*Kittles I, supra*, A154955, fn. omitted.)

Defendant appealed, we remanded the matter "to allow the trial court to exercise the discretion afforded it under Senate Bill No. 1393 (2017–2018 Reg. Sess.) and to issue an amended abstract of judgment to indicate defendant was convicted in count 2 of violating section 245, subdivision (b), assault with a semi-automatic firearm (and to also indicate any change in

5

sentence if the court so exercises its discretion under Sen. Bill No. 1393 (2017–2018 Reg. Sess.)).” (*Kittles I, supra*, A154955.)

"On remand, in addition to requesting that the court strike the enhancement for his serious felony conviction, defendant sought reconsideration of his entire sentence based on recent changes to sentencing laws and 'previously unpresented information about the conduct underlying [his] strike prior' and his efforts toward rehabilitation.

"The trial court struck the section 667, subdivision (a)(1) five-year enhancement, and otherwise reimposed the previous sentence, for an aggregate term of 21 years. The abstract of judgment was not corrected." (*Kittles II, supra*, A165979.) Defendant appealed asserting the trial court abused its discretion by "not choosing an offense other than attempted murder as the principal term in order to further reduce his term." We remanded "in order for the trial court to correct the abstract of judgment," but affirmed in all other respects. (*Ibid*.)

In December 2024, defendant filed a petition for resentencing pursuant to section 1172.6, alleging he was entitled to relief because he could not presently be convicted of attempted murder due to changes to section 188 or 189. The trial court appointed a public defender to represent defendant.

The People opposed, contending defendant had not made a prima facie case for relief because he was never prosecuted or convicted under the natural and probable consequences theory, and as the sole perpetrator, he was ineligible as a matter of law. The People asserted defendant's own testimony, the closing arguments, and the jury instructions and verdict all foreclosed relief.[3]

---

[3] The People attached 18 exhibits to the opposition. The exhibits included, among other things, excerpts of transcripts of defendant's

6

In his reply brief in support of a prima facie finding, defendant asserted the undisputed record did not eliminate the possibility he could have been convicted under a "now abolished imputed malice theory." Defendant identified a " 'material fact dispute,' " which he maintained necessitated an evidentiary hearing. Specifically, defendant did not contend there was another shooter, rather he maintained the jury could have found him guilty upon a finding that he (1) intentionally discharged a gun, (2) intending to kill one person (B.K.), but (3) that this act had the natural and probable consequence of causing serious injury to another person, the victim R.T. Although he had not been able to find a case "addressing imputed malice for attempted murder due to multiple targets rather than multiple defendants, this does not mean that no such eligibility exists."

After hearing argument from counsel, the court found there was an insufficient basis to establish a prima facie case and denied the petition.

## DISCUSSION

"On appeal from the denial of a section 1172.6 petition," if the "defendant subsequently files a supplemental brief or letter, the Court of Appeal is required to evaluate the specific arguments presented in that brief and to issue a written opinion. The filing of a supplemental brief or letter does not compel an independent review of the entire record to identify unraised issues." (*Delgadillo, supra*, 14 Cal.5th at pp. 231–232.)

testimony, the closing arguments by the People and defense counsel, and the jury instructions and verdicts. Defendant also cited to the exhibits in his brief in support of a prima facie finding. However, none of the exhibits are included in the record on appeal.

We therefore take judicial notice of the record in defendant's direct appeal (case No. A155955), which contains the jury instructions and verdicts, as well as the reporter's transcript attached to and referenced in the People's opposition and defendant's reply brief. (Evid. Code, § 452, subd. (d).)

7

In his supplement brief, defendant asks this court to review "any evidence, memorandums, exhibits, jury instructions, and or testimony relied upon in opposition of defendant's initially filed . . . 1172.6 resentencing petition."[4]  Defendant maintains the People "relied heavily on an invalid theory in accordance with . . . section 1172.6."[5]

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 (2017–2018 Reg. Sess.), making "ameliorative changes to our state's homicide law.  [Citation.]  As part of these ameliorative changes, malice, a key element the People must prove in a murder prosecution, may no longer be imputed to a defendant solely because the defendant participated in another crime." (*People v. Patton* (2025) 17 Cal.5th 549, 558 (*Patton*).)  As a result, "a defendant is no longer guilty of murder as an aider and abettor solely because the 'natural and probable consequences' of that other crime included a confederate's commission of murder."  (*Ibid.*)

---

[4]  Defendant also requests the exhibits attached to the People's opposition to his petition be forwarded to him for his review.  However, this is not the procedure prescribed by *Delgadillo*.  Our Supreme Court specified, "When appointed counsel finds no arguable issues to be pursued on appeal: (1) counsel should file a brief informing the court of that determination, including a concise recitation of the facts bearing on the denial of the petition; and (2) the court should send, *with a copy of counsel's brief*, notice to defendant, informing the defendant of the right to file a supplemental letter or brief and that if no letter is filed within 30 days, the court may dismiss the matter."  (*Delgadillo, supra*, 14 Cal.5th at pp. 231–232, italics added.)  This court informed defendant of his right to file such a letter or brief, and forwarded a copy of counsel's brief on December 16, 2025, and defendant responded with his supplemental brief.

[5]  We review de novo whether the trial court erred in denying a section 1172.6 petition at the prima facie stage.  (*People v. Williams* (2022) 86 Cal.App.5th 1244, 1251.)

Senate Bill No. 1437 (2017–2018 Reg. Sess.) also created a procedure for those convicted of murder under the former law to seek retroactive relief by filing a petition for resentencing under section 1172.6. (*People v. Strong* (2022) 13 Cal.5th 698, 708.) This procedure has since been expanded "to allow relief for those with 'attempted murder' convictions based on 'the natural and probable consequences doctrine.' " (*Patton, supra*, 17 Cal.5th at p. 558.)

The statute sets forth three conditions that must be met before a person may seek relief. (§ 1172.6, subd. (a).) As relevant here, first, the charging document allowed the prosecution to proceed under the natural and probable consequences doctrine for attempted murder. Second, the petitioner was convicted of attempted murder following a trial. Third, the petitioner could not presently be convicted of attempted murder because of changes to section 188 or 189. (*Id.*, subd. (a)(1)–(3).)

The statute also sets forth a three-step process by which section 1172.6 petitions are adjudicated. (§ 1172.6, subds. (b)–(d).) First, a petitioner must file a facially sufficient petition by indicating, among other criteria, that he meets the three requirements in subdivision (a). (*Id.*, subd. (b).) Second, if a facially sufficient petition is filed, the parties have an opportunity to submit briefing before the court holds a hearing to determine if the petitioner has made a prima facie case for relief. (*Id.*, subd. (c).) Third, if the court determines a prima facie showing has been made, it issues an order to show cause and holds an evidentiary hearing on "the ultimate question of resentencing at which the People will bear the burden of defending a conviction under the amended law." (*Patton, supra*, 17 Cal.5th at p. 556.)

The prima facie inquiry is limited. (*People v. Lewis* (2021) 11 Cal.5th 952, 971–972.) But, in assessing whether a defendant has made a prima

9

facie showing for relief under section 1172.6, the trial court is entitled to review the record of conviction, which will "necessarily inform the trial court's prima facie inquiry under section [1172.6], allowing the court to distinguish petitions with potential merit from those that are clearly meritless." (*Lewis*, at pp. 971–972; see *People v. Curiel* (2023) 15 Cal.5th 433, 463–464; *People v. Williams, supra,* 86 Cal.App.5th at p. 1251.)

The trial court properly determined defendant did not establish a prima facie entitlement to relief under section 1172.6.

Here, defendant was the sole perpetrator. At trial, he presented an alternate theory of self-defense. The jury did not find defendant acted in self-defense and convicted defendant of attempted murder. Defendant does not contend anyone other than he was the perpetrator (see e.g., *Delgadillo, supra*, 14 Cal.5th at p. 233 [denial of section 1172.6 appropriate where the petitioner was "the only participant in the killing"]) and, as such, relief is foreclosed.

In his reply brief in support of a prima facie finding, defendant did not deny that he was the sole perpetrator and there were no allegations of accomplice liability. Rather he maintained the jury could have found him guilty upon a finding that he (1) intentionally discharged a gun, (2) intending to kill one person (B.K.), but (3) that this act had the natural and probable consequence of causing serious injury to another person, the victim R.T. Defendant noted nothing in the charging documents precluded the prosecution from proceeding under any theory, and in the prosecutor's closing argument she stated, " 'unlike some other cases this one doesn't focus so much on the elements of attempted murder or assault with firearm, it focuses more on whether or not you find the evolving stories the defendant told you to be true.' " Additionally, the prosecutor argued defendant's behavior " 'from the moment [he] arrived he was looking for *somebody*. He was a man on a

mission,' " and later, although the prosecutor stated defendant " 'intentionally shot at [R.T.] four times,' " she also said "the defense made [R.T.] a target 'by proxy' and that the actual 'unlikeable target' was B.K. himself."

Next, defendant maintains the jury instruction for attempted murder did not specify R.T. as the victim.[6] He contends, although the trial court instructed the jury that "they had to find Kittles took a direct but ineffective step toward 'killing another person' and that he 'intended to kill that person' in order to convict," the instruction, "*did not specify that person's identity*," and as such "the 'person' Kittles took steps to and intended to kill could have been B.K." He also points out the instruction for the section 12022.53, subdivision (d) enhancement did specify R.T., and that instruction "explained the natural and probable consequences doctrine, specifying that '[a]n act causes great bodily injury if the injury is the direct, natural, and probable consequences of the act. . . . *A natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes.' " Further, that instruction noted the enhancement applies to count 1 (attempted murder).

The trial court, without "engaging in any fact-finding," did not agree with defendant's argument, and we conclude the trial court did not err.

To begin with, that the victim was not named in the attempted murder instruction is of no importance. The instruction does not require the victim to

---

6 As given, CALCRIM No. 600 provides, "Defendant is charged in Count 1 with attempted murder. [¶] To prove that the defendant is guilty of the attempted murder[,] the People must prove that, one, the defendant took at least one direct but ineffective step toward killing another person; and, two, the defendant intended to kill that person. [¶] . . . [¶] . . . A direct step indicates *a definite and unambiguous intent to kill. . . .*" (Italics added.)

11

be listed.  Further, it was abundantly clear that the victim of the attempted murder was R.T.  The prosecutor in her opening statement made clear the charges were as to the victim R.T.,[7] indeed she made no mention of B.K.  Additionally, defense counsel herself informed the jury of the victim in her closing argument that, "first of all, all of these Counts 1, 2 and 3 the alleged victim, the victim is [R.T.]"  Moreover, the jury verdict form itself listed R.T. as the victim.

Thus, by virtue of its verdict, the jury necessarily found defendant acted with intent to kill R.T.  The jury was never instructed on attempted murder under the natural consequences doctrine or any imputed-malice theory,[8] rather it was required to find defendant intended to kill R.T. to convict defendant of attempted murder.  (*People v. Cortes* (2022) 75 Cal.App.5th 198, 205 ["we presume the jury understands and follows the court's instructions"].)

Finally, we reject the assertion that the jury, despite the court's instructions, somehow extrapolated the natural-and-probable-consequences language from an enhancement to the count for attempted murder.  (See, e.g., *People v. Carr* (2023) 90 Cal.App.5th 136, 144 [" '[T]he use of the term "natural consequences" in the . . . definition of implied malice does not import

---

[7] The prosecutor stated, defendant "tried to take [R.T.'s] life," "by close of evidence . . . [y]ou will know that the defendant took his Glock, loaded, aimed it at [R.T.], pulled the trigger at least four times, shot [R.T.]," and "I'm going to ask you that you find the defendant . . . guilty . . . of the attempted murder of [R.T.]"

[8] To the extent defendant appears to argue he was improperly convicted under the felony-murder rule, he is incorrect.  California does not recognize the crime of "attempted felony murder."  (*People v. Bland* (2002) 28 Cal.4th 313, 328 [there is no crime of attempted felony murder if no death occurs during a felony]; *People v. Brito* (1991) 232 Cal.App.3d 316, 321; *People v. Patterson* (1989) 209 Cal.App.3d 610, 614.)

12

into the crime of murder the case law relating to the distinct "natural and probable consequences" doctrine developed in the context of aiding and abetting liability' "]; *People v. Soto* (2020) 51 Cal.App.5th 1043, 1059 ["The 'natural consequences' language in the instruction for second degree murder does not transform Soto's conviction into one for murder under the natural and probable consequences doctrine within the meaning of section [1172.6]."], abrogated on another ground by *Lewis, supra*, 11 Cal.5th at p. 957.) We likewise reject defendant's assertions that the prosecutor argued R.T. was a "target 'by proxy' " in her closing argument. The prosecutor's use of the phrase "by proxy" was made in response to defendant's self-defense claim, and the jury was instructed both that the statements of counsel were not evidence and that to convict defendant of attempted murder they were required to find he intended to kill.

In sum, the trial court did not err in denying defendant's section 1172.6 petition.

Defendant also makes several arguments in his supplemental brief that are beyond the scope of what may be addressed on appeal following a denial of a petition for resentencing: He accuses the trial court clerk and the court reporter of filing "false documents and dates that were not scheduled where the petitioner was niether [*sic*] present nor waived arraignment or rights afforded," specifically a December 2017 amended information. He contends his conviction for attempted murder should be vacated "in the interest of justice based on insufficient evidence and the prosecution's failure to meet their burden" and because the prosecutor "misrepresent[ed] facts." Defendant also takes issue with the trial court allowing the jury to "deliberate on an invalid . . . aiding and abetting theory lacking sufficient evidence allowing the jury to infer guilt on less than reasonable doubt," for

13

the section 12022.53, subdivision (d) allegation despite the fact the court "or the People [later] dismissed" this allegation in the interest of justice. "The mere filing of a section [1172.6] petition does not afford a new opportunity to raise claims of trial error or attack the sufficiency of the evidence supporting the jury's findings." (*People v. Farfan* (2021) 71 Cal.App.5th 942, 947.)[9]

Having reviewed the record, we conclude the trial court did not err in denying defendant's petition.

## DISPOSITION

The order is affirmed.

---

[9] Defendant also requests we take judicial notice of the " 'petitioner's brief' in support of prima facie showing" filed by his counsel. As this brief is included in the record on appeal, we deny the request.

_____

Banke, J.

We concur:

_____

Humes, P. J.

_____

Smiley, J.

A173585, People v. Kittles

15